IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CATHY CODE,<br><br>                  Plaintiff,<br><br>v.<br><br>ASPENWOOD REAL ESTATE CORP., ELITE LEGACY CORPORATION, JOHN AND JANE DOES I-X,<br><br>                  Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT<br><br><br>Case No. 1:15-CV-107 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendants' Motion to Dismiss and/or for Summary Judgment. The Court will grant Defendants' Motion in part for the reasons discussed below.

I. BACKGROUND

This case arises from a commission fee dispute on a sale of land in 2006. Still Standing, L.C. ("Still Standing") initially purchased the subject land—170 acres in the Ogden Valley— from the State of Utah in 1998. Prior to selling the property to Still Standing, the State warned that

> [t]here is likely no access. Although there is an ungraveled and unimproved road leading to the [P]roperty, it crosses privately owned lands. Historical access may exist, but the Trust Lands Administration is not guaranteeing access to the property.[1]

---

[1] Docket No. 21-2, at 3.

1

Despite this warning, Still Standing purchased the Property and attempted to establish access by filing suit in state court against neighboring property owners. Still Standing was unsuccessful and its claims were dismissed at trial.[2]

On January 20, 2006, Still Standing received an offer to purchase the Property from Emmett Warren through Re/Max Elite ("Remax") and entered into a For Sale By Owner Commission Agreement (the "FSBO") with Remax. On February 6, 2006, Warren and Still Standing entered into a Real Estate Purchase Contract (the "REPC") on the Property. It is alleged that the terms of the FSBO were triggered when the REPC was entered into and Still Standing then owed a real estate commission fee to Remax. When the purchase fell through, Warren, Still Standing, and Remax filed suit in Weber County state court asserting various claims, counterclaims, and crossclaims against each other for the failure of the sale and the earnest money held under the terms of the REPC. In 2008, Warren and Still Standing negotiated a settlement and the court dismissed all claims between them.

In 2009, Remax and its agent, Tim Shea, filed a Second Amended Answer and Counterclaim against Still Standing, adding both Chuck Schvaneveldt (Still Standing's principal and owner), and Cathy Code (Schvaneveldt's then girlfriend and now wife) to the lawsuit for the commission fee under the FSBO.[3] Schvaneveldt and Code were both alleged signatories to the FSBO. However, the state-trial court had previously ruled that Shea could not bring a claim for the commission in his own name, but allowed Remax to file its own counterclaim to seek the

---

[2] *Id*.
[3] Docket No. 21-17, at 4.

commission.[4] Shea's claims against Code were dismissed in 2010.[5] In January 2012, a Third Amended Answer and Counter Claim and Third Party Complaint was filed against Schvaneveldt and Code for the commission fee by Elite Legacy Corporation D/B/A Re/Max Elite, Aspenwood Real Estate Corporation D/B/A Re/Max Elite, and Hilary Own "Skip" Wing, principal broker D/B/A as Re/Max Elite.[6]

Prior to trial, the state court dismissed all of Still Standing's claims against Remax on summary judgment and all claims against Still Standing at a pretrial conference.[7] This left unresolved only Remax's commission claims against Schvaneveldt and Code.

In August 2012, a four-day jury trial was held. Code moved for directed verdict and was dismissed from the case. The jury found Schvaneveldt liable for Remax's commission fee.[8] The trial court ultimately held that since Code was not liable for the commission fee, she was entitled to recover part of her attorneys' fees. Both Code and Wing—a party to the litigation but not to the FSBO contract—have appealed the trial court's partial grant of Code's motion for attorneys' fees. Code has since withdrawn her appeal.[9]

Throughout litigation, Still Standing, Schvaneveldt, and Code asserted various arguments challenging Remax's claim to the commission fee, including alleging that Remax is a void dba with no legal recognition, that the REPC was forged and modified, and that the "brokers, agents,

---

[4] *Id*. at 5.
[5] *Id*. at 9.
[6] *Id*. at 11–12.
[7] *Id*. at 12–13.
[8] *Id*. at 13.
[9] Docket No. 31-9, at 1.

and employees committed a fraud in the handling of the REPC or knew that a fraud had been committed and failed to act."[10] Post-trial, Schvaneveldt began asserting new allegations of fraud against Elite Legacy Corporation and Aspenwood Real Estate Corporation—the Defendants in this case—over the transfer of rights to the dba Re/Max Elite. These allegations center on Dale Quinlan, who was an owner and principle broker of Aspenwood Real Estate Corporation at the time of its incorporation in 2005. Schvaneveldt essentially argued that at the time the FSBO and REPC were entered into with Remax, the dba was solely owned by Dale Quinlan, rather than by any other party. These allegations are the same allegations that underlie this federal lawsuit.

Defendant Aspenwood Real Estate Corp. ("Aspenwood") began as an LLC in 2003 and was converted into a corporation on March 11, 2005.[11] At the time of incorporation, Aspenwood had nine owners, including Shane Thorpe as President/Owner, Skip (Hilary) Wing as Vice President/Owner, and Dale Quinlan as Principle Broker/Owner.[12]

In 2004, Mr. Quinlan filed with the State of Utah a "Business name Registration/DBA Application" for use of the dba "Re/Max Elite."[13] Mr. Quinlan states that he applied for use of the DBA as the "sole 'applicant/owner'"[14] and "was conducting business in the real estate profession as Dale Quinlan, DBA RE/MAX ELITE."[15]

---

[10] Docket No. 21-35, at 7.
[11] Docket No. 21-12, at 3.
[12] *Id.*
[13] Docket No. 31-6, at 3.
[14] *Id.* at 1.
[15] *Id.*

4

Mr. Thorpe, Aspenwood's President/Owner, states that Mr. Quinlan was asked to file the "Business Name Registration/DBA Application" on behalf of Aspenwood. Mr. Thorpe alleges that in February of 2006, Aspenwood discovered that Mr. Quinlan had listed himself as owner of the dba and asked Mr. Quinlan to correct this "error."[16]

A letter dated March 7, 2006, entitled "Re: Transfer Ownership of Aspenwood Real Estate Corp. DBA Re/Max Elite," transferred "the ownership of Aspenwood Real Estate Corp from Dale Quinlan to Shane Thorpe."[17] It was signed, "Sincerely, Dale Quinlan." Mr. Thorpe asserts that the letter incorrectly transferred Mr. Quinlan's ownership interest of Aspenwood to Mr. Thorpe instead of the rights of the dba Re/Max Elite to Aspenwood. A second letter was created, dated March 9, 2006, entitled, "Re. Transfer Ownership of DBA Re/Max Elite," which transferred "the ownership of Re/Max Elite from Dale Quinlan to Aspenwood Real Estate Corp."[18] That letter was also signed "Sincerely, Dale Quinlan."

Mr. Quinlan states that he examined the two letters and has no recollection of signing either of the letters. He believes his "signature appears to be exactly the same on both pages but [that he] never gave anybody permission to just copy [his] signature to any Re/Max Elite letter."[19] Mr. Quinlan alleges that he was the sole owner of the dba Re/Max Elite and was the contracting party during the months of January and February 2006, when the FSBO and REPC were entered into.

---

[16] Docket No. 21-12, at 7.
[17] Docket No. 31-1, at 9.
[18] *Id.* at 7.
[19] Docket No. 31-6, at 1.

In December 2006, Mr. Quinlan sold his ownership shares back to Aspenwood. Mr. Quinlan stayed on as an agent with Aspenwood until he left the company in April 2007.

The March 7 and March 9, 2006 letters substantially form the basis of Schvaneveldt and Code's allegations of fraud against Aspenwood and Elite Legacy. In a post-trial Motion to Dismiss Commission Claims Based on Lack of Standing and Jurisdiction filed in state court on July 8, 2013, Schvaneveldt argued for the first time that at the time the FSBO was entered, the rights of the dba Re/Max Elite did not belong to Aspenwood and Elite Legacy, but instead belonged to Mr. Quinlan. Schvaneveldt argued that Mr. Quinlan held the rights to the dba Re/Max Elite and never transferred the rights to Aspenwood; therefore, Aspenwood and Elite Legacy did not have any rights to the commission claim against Schvaneveldt. Schvaneveldt's argument was rejected by the Weber County state court.

Schvaneveldt reasserted this argument in a subsequent "Rule 60(b) Motion for Relief from Judgment" requesting relief from the commission claim judgment. At this point in the litigation, Code, Schvaneveldt, and Still Standing entered into a Settlement and Assignment Agreement with Mr. Quinlan, dated July 12, 2013, in which

> Dale Quinlan, individually, and Dale Quinlan DBA Remax Elite and formerly DBA Remax Elite, along with his agents, promise not to pursue or continue to pursue any existing nor future legal action, claim, appeal, judgment nor collection against the Seller. This agreement includes but is not limited to any and all claims or commission claims or rights in any way related to the Seller and/or based on any For Sale By Owner Commission Agreement (FSBO), including the FSBO with January 20, 2006 . . . or any REPC, including the REPC allegedly signed by [Schvaneveldt] on February 7, 2006, and/or related . . . in the litigation case number 060906802. Remax Elite agrees it will dismiss all commission claims and related claims against the Seller in [that case]. . . .[20]

---

[20] Docket No. 31-12, at 1.

Additionally, Schvaneveldt obtained from the State of Utah Department of Commerce a letter, dated December 11, 2013, which states in its entirety:

> Because of administrative action, the attached letter in the file of Re/Max Elite, file number 5800619-0151, had been invalidated. The ownership of the DBA Re/Max Elite has been returned to Dale Quinlan.[21]

The state court again rejected these arguments. The state court's ruling on Schvaneveldt's Rule 60(b) Motion and the issue regarding Mr. Quinlan's ownership rights are currently on appeal before the Utah Court of Appeals.[22] Meanwhile, in March 2014, Still Standing filed its First Amended Complaint in Davis County state court based on the Quinlan argument. In its First Amended Complaint, Still Standing asserts four causes of action for (1) declaratory action and injunctive relief, (2) civil conspiracy and fraud, (3) negligence, and (4) wrongful use of civil proceedings and abuse of process. The Davis County case is currently stayed pending the Weber County case appeal.[23]

Code filed this lawsuit on August 25, 2015, based on the same Quinlan argument. In her Complaint, Code alleges that Defendants "conspired to create forged documents that they filed with the Utah Division of Corporations, then made subsequent false transfers, as part of their fraudulent real estate commission scheme."[24] Code asserts two causes of action for (1) civil conspiracy and fraud and (2) fraudulent wrongful use of civil proceedings and fraudulent abuse of process. She states that her "claims are based entirely on Defendants' fraudulent acts and

---

[21] Docket No. 31-7.
[22] Docket No. 21-4, at 85; *see also* Docket No. 21-22, at 10.
[23] Docket No. 21-36, at 12.
[24] Docket No. 2, at 1.

fraudulent omissions which caused the severe damages described in [the] complaint,"[25] including "litigation costs, fees, expenses, collateral damages, and lost opportunities."[26]

II. DISCUSSION

Defendants Aspenwood and Elite Legacy (collectively, "Defendants") bring this Motion to Dismiss and/or for Summary Judgment and request the Court dismiss Code's claims under four legal theories: (1) the *Colorado River* doctrine; (2) the *Rooker-Feldman* abstention doctrine; (3) two Utah statutes of limitations; and (4) res judicata. Additionally, Defendants argue that Code filed this lawsuit in federal court in bad faith and that Defendants should be awarded attorneys' fees for having to respond.

Having reviewed and considered the parties' arguments, the Court will stay this matter under the *Colorado River* doctrine and decline to reach any of Defendants' other arguments for dismissal.

Defendants seek dismissal of this case under the *Colorado River* abstention doctrine. *Colorado River* controls, where, as here, a district court is asked to stay or dismiss a federal suit pending the resolution of a parallel state court proceeding.[27] Generally, "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'"[28] However, dismissal based on "considerations of wise judicial

---

[25] *Id*.

[26] *Id*. at 10.

[27] *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999).

[28] *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).

administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" is permitted under the *Colorado River* doctrine.[29]

*Colorado River* is only applicable in very limited and exceptional circumstances.[30] The Supreme Court has set forth a number of factors to consider in determining whether an exceptional circumstance exists.[31] "Before examining these factors, however, a federal court must first determine whether the state and federal proceedings are parallel."[32] "[E]xact identity of parties and issues is not required. Rather, state and federal proceedings are sufficiently parallel if 'substantially the same parties litigate substantially the same issues.'"[33]

Once a court decides that the state and federal litigations are parallel, the court must then determine whether deference to state-court proceedings is appropriate.[34] The Supreme Court in *Colorado River* provided four factors to consider in assessing whether deference is warranted: (1) whether the state or federal court first assumed jurisdiction over the same res; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; and (4) the order in which jurisdiction was obtained by the concurrent forums.[35]

---

[29] *Id.* (internal quotation and citation omitted).

[30] *Id.* at 818.

[31] *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994).

[32] *Id.*

[33] *United States v. City of Las Cruces*, 289 F.3d 1170, 1182 (10th Cir. 2002) (quoting *Fox*, 16 F.3d at 1081).

[34] *Fox*, 16 F.3d at 1082.

[35] *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1234 (10th Cir. 2013) (citing *Colorado River*, 424 U.S. at 818).

The Court noted that "[n]o one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required."[36]

Since the original *Colorado River* factors were set out, the Supreme Court in *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation*[37] additionally allowed consideration of whether federal law provides the rule of decision on the merits and whether the state-court proceedings adequately protect the litigants' rights.[38] The Court also strongly suggested that courts may take into account the possibly "vexatious or reactive nature of either the federal or the state litigation."[39] All of these considerations must "be applied in a pragmatic, flexible manner with a view to the realities of the case at hand."[40] "Only the clearest of justifications will warrant dismissal."[41]

Defendants argue that this case is an exceptional circumstance warranting dismissal under *Colorado River*. Defendants argue that there is a danger of piecemeal litigation, that significant progress has been made in state court, federal law is not implicated, state court proceedings would adequately protect the parties' rights, and that this case is vexatious and reactive in nature.

---

[36] *Colorado River*, 424 U.S. at 818–19.

[37] 460 U.S. 1 (1983).

[38] *D.A. Osguthorpe Family P'ship*, 705 F.3d at 1235.

[39] *Moses H. Cone*, 460 U.S. at 17 n.20.

[40] *Id.* at 21.

[41] *Colorado River*, 424 U.S. at 819.

Code argues that *Colorado River* is inapplicable because there is no parallel state-court litigation. Code asserts that she was dismissed from the Weber County case and is no longer a party to the suit. She also asserts that she is not the plaintiff in the Davis County case. Therefore, Code argues she does not have any claims pending in state court that pose a risk of piecemeal litigation.

As set forth above, exact identity of parties is not required. Parallel proceedings exist where substantially the same parties litigate substantially the same issues in different forums. Here, Code, Schvaneveldt, and Still Standing—all original parties in the Weber County case—have ongoing litigation at either the Utah Court of Appeals, Davis County state court, or federal court, involving the same allegations of forgery and the alleged creation of a fraudulent real estate commission scheme by Defendants to obtain a commission under the FSBO in 2006. Thus, the federal and state proceedings are parallel.

Since parallel proceedings exist, the Court next looks to the *Colorado River* factors to determine whether this case presents an exceptional circumstance warranting deference to the state courts. *D.A. Osguthorpe Family Partnership v. ASC Utah, Inc*. provides helpful guidance. In *D.A. Osguthorpe*, the Tenth Circuit applied *Colorado River* and affirmed the federal district court's dismissal of a case that had originated in Utah state court. The state-court litigation involved a dispute arising under a Development Agreement between several parties. When development stalled, the parties filed suit against each other alleging various claims for breach of contract. At some point in the litigation, Osguthorpe filed a motion to compel arbitration under the Development Agreement. The state-court judge denied Osguthorpe's motion. Osguthorpe appealed the state-court judge's ruling denying arbitration and asked the state-court judge to

11

recuse himself from the case, vacate his ruling on arbitration, and stay proceedings pending the outcome of the interlocutory appeal. When the state-court judge denied Osguthorpe's requests, Osguthorpe petitioned the Utah Supreme Court for emergency relief and for an immediate stay of all trial-court proceedings pending the resolution of its appeal. The Utah Supreme Court summarily denied Osguthorpe's petition.

Osguthorpe then turned to the federal courts for relief, requesting declaratory judgment that the state district court had violated Osguthorpe's due-process rights, and additionally sought an immediate injunction against ASC Utah, Wolf Mountain, the state-court judge, and the Third Judicial District Court from proceeding with the case until resolution of the arbitration appeal.

The federal district court in that case dismissed Osguthorpe's case for lack of subject-matter jurisdiction under *Rooker-Feldman* and "the general principles of abstention."[42] The Tenth Circuit affirmed the district court's ruling based on the "general principles of abstention"—more specifically, under the *Colorado River* doctrine.[43]

The Tenth Circuit found that the first two *Colorado River* factors did not apply in *D.A. Osguthorpe*. The first factor—whether the state or federal court first assumed jurisdiction over the same res—was inapplicable because neither court assumed jurisdiction over property. The second factor—the relative inconvenience of the federal forum— was afforded scant weight because the state and federal courthouses involved were at "no great geographical distance from

---

[42] *D.A. Osguthorpe Family P'ship*, 705 F.3d at 1230.
[43] *Id*. at 1231.

12

each other."[44] However, the court found that the remaining factors weighed heavily in favor of dismissal.

Of "paramount" consideration was the third factor: "the danger of piecemeal litigation."[45] The state-court litigation in *D.A. Osguthorpe* spanned five years and amassed "thousands of entries and spans nearly two hundred pages in the record."[46] The litigation "consumed years of intensive court involvement, voluminous motion practice, extensive discovery, and even substantial physical resources as basic as paper, copy toner, and storage space."[47] The state-court litigation became "profoundly intertwined with the machinery of the Utah judicial system."[48] Additionally, "the Utah state court had already overseen years of intensive litigation before the federal court's jurisdiction was invoked."[49] This fact ties into the fourth *Colorado River* factor—the order in which the state and federal courts obtained jurisdiction in the matter. With this factor, "'priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.'"[50] In *D.A. Osguthorpe*, "[a]ll progress in this case . . . [was] made in the state court."[51]

Moreover, the court additionally considered whether federal law applied, whether the state-court proceedings would adequately protect the litigants' rights, and also took into account

---

[44] *Id.* at 1234.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.* at 1235.
[49] *Id.*
[50] *Id.* (quoting *Moses H. Cone*, 460 U.S. at 21).
[51] *Id.*

the possibly vexatious or reactive nature of either the federal or the state litigation. The court concluded that although the Federal Arbitration Act governed the merits of Osguthorpe's arbitration claims, that factor "does not automatically compel the conclusion that the resolution of a claim arising under the Act is a task better suited for the federal courts."[52] The court found that there was also no indication that Osguthorpe's rights were somehow less protected in state court. Finally, the court also took into account the fact that "Osguthorpe came to the federal courts for relief only after receiving an unfavorable state-court ruling on arbitrability several years after litigation had begun in Utah's state-court system."[53] Thus, having applied the *Colorado River* factors in a "pragmatic, flexible manner with a view to the realities of the case at hand," the Tenth Circuit concluded that the case had been "interwoven with a state-court system—on both the trial and appellate levels"[54] and that the case "should live out the rest of its days in the place where it began: the Utah state courts."[55]

As in *D.A. Osguthorpe*, the first two *Colorado River* factors do not apply in this case. However, the remaining factors weigh decidedly in favor of withholding the exercise of jurisdiction. First, the danger of piecemeal litigation is considerable. This lawsuit began in 2006, when Warren, Still Standing, and Remax filed suit against one another in Weber County district court after the proposed sale on the Property fell through. From 2006 until Code filed her lawsuit in federal court in August 2015, litigation in the Weber County state court has generated more than 9000 pages of filed documents and is now on appeal after having reached final

---

[52] *Id*.
[53] *Id*.
[54] *Id*.
[55] *Id*. at 1236.

judgment on the merits. The issues raised by Code in this suit have been addressed by the parties and the Weber County state court and are currently on appeal. The Davis County case is currently stayed pending resolution of the Weber County appeal. While Code is correct that she does not have any pending claims in state court, her claims here are intimately bound up in the ongoing state litigation. The primary issues are who owns the Remax DBA and who, if anyone, is entitled to the commission. As these issues are currently before the state court, this factor weighs in favor of state-court deference. In the same way as *D.A. Osguthorpe*, this case consumed years of intense court involvement, substantial judicial resources, and is interwoven with the state court at both the trial and appellate level.

Second, all progress—several years of litigation—was made in state court before this court's jurisdiction was invoked. This factor weighs heavily in favor of state-court deference. "*Colorado River* concerns itself with efficiency and economy."[56] "Its goal is to preserve judicial resources"[57] and avoid "duplicative litigation."[58]

As stated, many of the key issues underlying Code's claims are making their way through the Utah state courts. Moreover, federal law is not implicated in this case and there is no indication that Code's rights are somehow less protected in the Utah state-court proceedings. Further, Code did not come to federal court until her husband received unfavorable rulings in the state court. Thus, having considered the combination of *Colorado River* factors against the

---

[56] *Id*. at 1233.

[57] *Id*. (internal quotation and citation omitted).

[58] *Id*.

obligation to exercise jurisdiction, the Court believes "clear justifications" exist warranting state-court deference under the *Colorado River* doctrine.

While the Supreme Court has declined to address whether deference to state-court proceedings under *Colorado River* should result in a stay or a dismissal of the federal action,[59] the Tenth Circuit has stated that "the better practice is to stay the federal action pending the outcome of the state proceedings."[60] That way, "[i]n the event the state court proceedings do not resolve all the federal claims, a stay preserves an available federal forum in which to litigate the remaining claims, without the plaintiff having to file a new federal action."[61] Accordingly, the Court will stay this case pending resolution of the state proceedings, allowing Code access to this Court in the event the state-court proceedings do not resolve all issues.

## III.  CONCLUSION

It is therefore

ORDERED that Defendants' Motion to Dismiss and/or for Summary Judgment is GRANTED IN PART. This matter is stayed pending resolution of the state-court proceedings. The Clerk of the Court is directed to administratively close this case forthwith. The parties are directed to provide the Court a joint status report within thirty days (30) of the decision by the Utah Court of Appeals.

---

[59] *Moses H. Cone*, 460 U.S. at 28.

[60] *Fox*, 16 F.3d at 1083.

[61] *Id*.

16

DATED this 29th day of June, 2016.

BY THE COURT:

_____
Ted Stewart
United States District Judge